**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACK AND TERRI ZAUSA, | ) | Case No.:  16-cv-01308 |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID SWEIS and SWEIS LAW FIRM, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

**JACK AND TERRI ZAUSA'S MEMORANDUM IN SUPPORT OF HIS RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**

Jack and Terry Zausa are former homeowners who lost their family home and now face eviction. Although they were accused of missing mortgage payments, leading to a foreclosure, the missed payments arose solely because Mrs. Zausa wrote checks that were wrongfully dishonored by third party bank. At all times, Mrs. Zausa's bank account had sufficient funds to cover the checks she wrote. The Zausas hired defendants, a lawyer and his law firm, to save their home. Although foreclosure is reputed to be difficult to defend, this case presented an easy defense: the home could be saved through reinstatement because the Zausas had sufficient money. A cause of action existed against the bank that wrongfully dishonored Mrs. Zausa's checks, leading to foreclosure. The Zausa home could be saved with one or two hours of work advising them about reinstatement and obtaining needed figures. However, they hired Defendants and were plunged into the quagmire of predatory, neglectful foreclosure "defense."

Both Jack and Terri Zausa intend to be plaintiffs. Leave to amend the complaint will be sought to correct an oversight in the original caption if needed.

Defendants have filed a Motion to Dismiss Pursuant to FRCP 12(b)(6).

1

## INTRODUCTION

The Zausas seek to recover damages caused by Defendants' failure to competently represent them in the foreclosure on their home and a collection matter in which they were the plaintiffs. Both cases were lost by the Zausas through outrageous neglect by Defendants. In the foreclosure, Defendants actually failed to show up in court on the date of judgment, leaving the Zausas with no representation at all at this critical juncture. In the collection matter, Defendants withdrew on the eve of trial, leaving the Zausas no time to get new counsel.

The Zausas bring their claims under the Federal Truth in Lending Act ("TILA") (Count I). This count is premised on Defendants' failure to make TILA disclosures when they entered into an open-ended credit contract with the Zausas. While Defendants now claim, in their Motion to Dismiss, that the contract was not open-ended, it, in fact, called for additional payments. Defendants try to evade TILA's requirements by characterizing the contract as a security retainer. However, as is set forth more fully below, the contract did not meet the requirements for a security retainer in Illinois. As written, the contract entitled Defendants to immediate ownership of all sums paid upon receipt and did not require Defendants to deposit the funds in an escrow account. Therefore, the contract anticipated that Defendants would perform work, send invoices, and be paid by the Zausas. The fact that the first 12 hours were paid in a lump sum of which the contract allowed Defendants to spend immediately for their own purpose does not avoid the nature of the credit contract.

In Counts II and III, the Zausas bring state law claims for legal malpractice and breach of contract, respectively. These counts are not attacked by Defendants.

## FACTS ALLEGED IN THE ZAUSAS' COMPLAINT

David Sweis is an attorney admitted to practice law in Illinois. (Doc. 1, ¶4). The Zausas consulted with Sweis with regard to a mortgage foreclosure proceeding related to property the Zausas owned in Burr Ridge, Illinois ("the Property"), and with regard to the collection of a 2010 judgment entered in favor of the Zausas in a separate case. (Doc. 1, ¶6). The property was the Zausas' home, and the transaction with Defendants was a consumer transaction. (Doc. 1, ¶10). Following the discussion, on May 13, 2013, the Zausas retained Sweis, at which time Jack Zausa signed a retainer agreement. (Doc. 1, ¶¶12-14, Doc. 1-1).

Pursuant to the terms of the retainer agreement, Zausa agreed to pay Sweis an initial retainer of $3,000.00 plus court costs. (Doc. 1-1). The initial retainer reserved "a total of twelve hours of any and all services" to be performed by Sweis, and was to be replenished upon exhaustion. (*Id*.) Zausa also agreed that he would be responsible for any and all court costs and litigation expenses incurred or advanced by Sweis relating to the representation. (*Id*.) The retainer agreement was terminable at will by either Zausa or Sweis. (Doc. 1-1).

Zausa agreed to be liable to Sweis in *quantum meruit* for the reasonable value of any work performed prior to termination, and Zausa agreed to pay billing statements rendered to him for amounts due "upon receipt thereof." (Doc. 1-1). As a curious indicator of greed and the one-sided nature of the contract, the contract provided, with regard to the payment: "This obligation of the Client is not variable upon whether the terms of the payment are flat fee, an hourly rate, or on a contingency fee basis." (Doc. 1-1). Zausa paid Sweis the initial retainer fee of $3,000.00 via a check drawn on an account in the name of LaSalle Street Financial, LLC (Check No. 2472). (*Id*.). The contract to pay Defendants was an open-ended consumer contract that, potentially, could be paid with monthly payments of over four installments. (Doc. 1, ¶36; Doc. 1-1). Because

3

payments to Defendants were capable of being subject to more than four installments, the transaction was subject to TILA. 15 U.S.C. § 1638(a)(3) and (4), and FRB Reg. Z, § 226.18(d) and (e). (Doc. 1, ¶37). However, no TILA disclosure was provided. (Doc. 1, ¶ 38).

**STANDARD OF REVIEW**

Other than an inexplicable reliance on very old cases, dating back to 1990, Defendants correctly state the standard of review.

**ARGUMENT**

I.    **TILA IS APPLICABLE TO THE CONTRACT BETWEEN THE ZAUSAS AND DEFENDANTS**.

A.    **TILA COVERS CONTRACTS BETWEEN ATTORNEYS AND CLIENTS.**

The plain-language of TILA provides no exception for attorneys. 12 C.F.R. 226.3. The courts are bound to consider the statutory language and defer to regulations and official staff commentary. As the Seventh Circuit has held:

> "Courts pay particular heed to the FRB Staff Commentary to TILA's regulations when evaluating an alleged TILA violation. The Supreme Court has held that "deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z[and] ... [u]nless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). In keeping with Milhollin, this court has deferred to the views of the FRB, as expressed in the Commentary, when we are called upon to interpret TILA. Our treatment of the commentary interpreting 15 U.S.C. § 1638(a)(6), the portion of TILA at issue in this case, is no exception. Clay v. Johnson, 264 F.3d 744, 748 (7th Cir.2001)." *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525, 528(7th Cir., 2007).

Neither the statute, nor the regulation, nor any commentary provide an attorney exception. Defendants do not point to one.

Defendants cite one case, a New Jersey state court case, for the proposition that attorneys can never be liable to clients under TILA. (Memo, P. 7). This case is S*key & Bhattacharya LLC*

4

*v. Ehsan*, 110 A.3d 986 (2014). Even though this is a case from another district, or state, Defendant provides no copy of the case.

It is unfortunate that Defendants were unable to locate the many Federal cases on the issue of attorney liability under TILA. These cases make it clear that attorneys may be creditors for the purposes of TILA.

While not in the Seventh Circuit, Minnesota is close enough to Illinois to be a sister state. Minnesota's Federal district courts have held attorneys may be liable under TILA multiple times. *Maus v. Toder*, 681 F. Supp. 2d 1007 (D. Minn., 2010) (**Exhibit A**) and *Dougherty v. Hoolihan, Neils, and Boland, Ltd.*, 531 F.Supp. 717 (D. Minn., 1982) (**Exhibit B**). Should one wish to consider the opinions of state-court judges, a thorough search reveals that states have not fallen in line with the one New Jersey case cited by Defendants. In fact, attorneys were not immunized (or were found to have complied with TILA or state-law equivalents) in *Porter v. Hill*, 108 Or.App. 418, 815 P.2d 1290 (Or. App., 1991) (**Exhibit C**), *Peterson v. Gustafson*, 584 N.W.2d 660 (Minn. App., 1998) (**Exhibit D**)*, and *Ault v. General Property Management Co*., 683 P.2d 988 (Okla.App. Div. 4, 1984) (**Exhibit E**).

Perhaps the most instructive of the above cases is the Federal case, *Dougherty v. Hoolihan, Neils, and Boland, Ltd.*, 531 F.Supp. 717 (D. Minn., 1982). **Exhibit B**. The court rejected an argument similar to the one at issue in this case, that attorney fees never fall within the purview of TILA:

> "Defendant argues on the basis of *Kenney v. Landis Financial Group, Inc*., 376 F.Supp. 852 (N.D.Iowa 1974) that legal services must be considered commercial and thus not subject to the Act. In *Kenney* the court found that because the plaintiff had taken out a loan to finance a lawsuit under the Truth in Lending Act, and not to purchase a washer and dryer for his family's use as he contended, the transaction was not a consumer credit transaction. 376 F.Supp. at 853-854. At no point does the court state the broad holding suggested by plaintiff, and it would appear that the decision was predicated on the unique facts presented in the case. Moreover, the Federal Reserve Board has stated its opinion that legal fee agreements can constitute consumer credit transactions. *See* FRB Letter,

Nov. 18, 1971, CCH Consumer Credit Guide ¶¶ 2330, 30,771. The Board's constructions of the statute and regulations are entitled to deference "because of the important interpretive powers granted to the agency in this very complex field." *Bright v. Ball Memorial Hospital Association, Inc.*, 616 F.2d 328, 333, n. 1 (7th Cir. 1980)." *Id*. at 721.

While the cases stated above are persuasive, the Federal Reserve Board's interpretation commands deference. The standard of deference alluded to in the Seventh Circuit's case, *Bright,* 616 F.2d at 333, has not changed. It has been strengthened. A recent Supreme Court case reiterating the necessity of deference to administrative interpretations is *City of Arlington v. Fed. Commc'ns Comm'n*, 133 S.Ct.1864 (2013).

Defendants have offered one legal theory based in case law, a single state of New Jersey decision. Their premise, that attorneys are immune from TILA liability, conflicts with case law from other jurisdictions, including Federal courts. Most importantly, Defendants' theory is in direct conflict with the Federal Reserve Board's interpretation of TILA, a statute it enforces. The principal of *Chevron* deference demands rejection of Defendants' argument in favor of deference to the rules of the administrative agency that enforces TILA. Legal services are covered by TILA. There is no exception for the over-reaching attorney in the Act. 12 C.F.R. 226.3. Defendants' Motion to Dismiss must be denied.

**B.** **DEFENDANTS' WRITTEN RETAINER CONTRACT, DRAFTED BY DEFENDANTS, IS UNCLEAR AS TO WHAT PAYMENTS ARE REQUIRED OF THE ZAUSAS.**

Defendants offered the Zausas a written contract. It defines money paid as a classic retainer, reserving 12 hours. (Doc. 1-1). This is to be replenished, however. In addition, certain court costs are to be paid, but it is unclear when or how that money will be advanced.

Further down on the same page, Zausa agreed to be liable to Sweis in *quantum meruit* for the reasonable value of any work performed prior to termination, and Zausa agreed to pay billing statements rendered to him for amounts due "upon receipt thereof." (Doc. 1-1).

6

It isn't clear when or how Defendants wanted their money, but it is clear they want it—and a lot of it.

Defendants specify, in the contract (Doc. 1-1) that the contract and the initial $3,000.00 payment is a "classic" retainer. While they say this secures up to twelve hours of service, this is in direct conflict with the definition of "retainer" as recognized by the Illinois Supreme Court:

> "Two types of retainers are generally recognized. The first is variously referred to as the 'true,' 'general,' or 'classic' retainer. Such a retainer is paid by a client to the lawyer to secure the lawyer's availability during a specified period of time or for a specified matter. This type of retainer is earned when paid and immediately becomes property of the lawyer, regardless of whether the lawyer ever actually performs any services for the client. *In re McDonald Bros. Construction, Inc.*, 114 B.R. 989, 998 (Bankr. N.D.Ill.1990)." *Dowling v. Chicago Options Associates, Inc.*, 875 N.E.2d 1012, 226 Ill.2d 277, 314 Ill.Dec. 725 (Ill., 2007).

Although Defendants' represented, in their contract, that they were accepting a classic retainer, it was not one. It limited to work done for the $3,000.00 to, at most, twelve hours. (Doc. 1-1) Further, it reserved the right to demand more payment for hours worked and for costs, but the terms and conditions of these additional payments were not specified. Next, it reserved the right to be paid in *quantum meruit,* allowing Defendants to step outside the contract and demand the "value" of their services at any time. In other words, the Zausas were pressed into a usurious relationship with Defendants where they could be called upon to empty their pockets at any time.

Defendants' contact was to be a security retainer. In *Dowling*, 875 N.E.2d at 1022 – 1023, cited above, the Illinois Supreme Court went on to recognize advance payment retainers. It set forth requirements that lawyers make it clear what kind of retainer was being taken in each case. However, at the end of the lengthy discussion, the court, perhaps anticipating that some lawyers would continue to believe the law inapplicable to them, added that a "security retainer" was the default:

> "Any written retainer agreement, regardless of the type of retainer contemplated, should clearly define the kind of retainer being paid. If the parties agree that the client will pay a

security retainer, that term should be used in the agreement; it should also state that the funds remain the property of the client until used to pay for services rendered and that the funds will be deposited in a client trust account. If the parties determine that an advance payment retainer best meets the client's needs, the written agreement must use that term and clearly state that the funds become the property of the lawyer when paid and that they will not be held in a client trust account.

"Advance payment retainer agreements must be in writing and they must clearly disclose to the client the nature of the retainer, where it will be deposited, and how the lawyer or law firm will handle withdrawals from the retainer in payment for services rendered. Having a written agreement reduces the risk of misunderstandings between a lawyer and client regarding the nature of the retainer paid by the client. As the ARDC Handbook advises lawyers:

'Because the character of the funds is determined by the fee agreement, it is wisest and most consistent with a lawyer's fiduciary obligations to assure that you and the client explicitly agree on how the advanced fees should be held and to reduce that agreement to writing. If you do not do so, you risk being second-guessed, in hindsight, often when your relationship with the client has soured, when there is a disagreement about what services were promised, and when the retainer has already been spent.' Client Trust Account Handbook pt. IV(A)(5).

"A written agreement providing for an advance payment retainer must contain language advising the client of the option to place his or her money into a security retainer. The agreement must clearly advise the client that the choice of the type of retainer to be used is the client's alone; provided, however, that if the attorney is unwilling to represent the client without receiving an advance payment retainer, the agreement must so state, including the attorney's reasons therefor. In addition, an advance payment retainer agreement must set forth the special purpose behind the retainer and explain why an advance payment retainer is advantageous to the client.

"Finally, in the event that the parties' intent cannot be gleaned from the language of their agreement, we conclude that the agreement must be construed as providing for a security retainer."

Here, Defendants failed to indicate what kind of retainer they were taking. They failed to advise their clients of any options, where money would be deposited, how money would be applied, or to otherwise in any way show any ethical concern for their clients.

However, the security retainer was to pay for 12 hours of work. No accounting was ever sent to the Zausas, but it is easy to see that what was Sweis' ($3,000.00) was Sweis' and what

was Zausas' (sums billed in the future or quantum meruit) was also Sweis'. What is not clear,
however, is any disclosure as to the amount Zausas would pay, any interest or finance charge, or
the total they would pay.

Because it was vague, and, frankly, unusual, Defendants' retainer is distinguishable from
that at issue in *Riethman v. Berry*, 287 F.3d 274 (3rd Cir. 2002), the case relied upon by
Defendants. In *Riethman*, the attorney retainer agreements in question provided for billing on
a monthly basis. Bills were to be paid in full within thirty days, with an interest charge to be
imposed on unpaid balances. In sharp contrast, Defendants' contract was unclear as to whether
there was some kind of retainer (security, advance payment, or otherwise), when bills would be
sent, or whether payment would just be sought via *quantum meruit*. (Doc. 1-1).

Defendants were required to comply with TILA and did not. The Motion to Dismiss must
be denied.

### C. WHETHER A FINANCE CHARGE WAS IMPOSED IS A FACTUAL INQUIRY.

Defendants make much of the fact that they say no finance charge was assessed.
However, a finance charge need not be characterized as such to invoke TILA coverage; in fact,
the Seventh Circuit has recognized the lengths to which a creditor might go to disguise a finance
charge:

> "As we noted above, TILA requires creditors to disclose clearly and accurately any
> finance charge that the consumer will bear in a particular credit transaction. As the
> definitions set forth above indicate, this means that a creditor-merchant must disclose to a
> consumer buying on credit exactly how much he will pay for that credit. See 12 C.F.R. §
> 226.4(a) (defining finance charge as "the cost of consumer credit as a dollar amount"). In
> this case, the Walkers allege that Wallace is charging higher prices to customers who are
> buying cars on credit than to customer who are paying cash. In other words, credit
> customers, such as the Walkers, are paying higher "cash" prices only because they are
> buying on credit. The higher cash price paid by these customers is therefore part of the
> cost of buying on credit. Under TILA, such a cost is a finance charge and must be
> disclosed to the consumer as such. Accordingly, we conclude that the Walkers have
> alleged sufficient facts to state a cause of action against Wallace under TILA.

"Our conclusion that the Walkers allege sufficient facts to state a cause of action under TILA is supported by the Supreme Court's exposition of the concept and effect of a "hidden finance charge" in Mourning. In that case, the Court noted that "[o]ne means of circumventing the objectives of the Truth in Lending Act, as passed by Congress, was that of 'burying' the cost of credit in the price of goods sold." Id. at 366, 93 S.Ct. 1652. The Court explained further that, in many credit transactions, creditors sought to evade TILA's mandate by claiming that no finance charge had been charged and assuming "the cost of extending of credit as an expense of doing business, to be recouped as part of the price charged in the transaction." Id. To illustrate this concept, the Court provided the following example:

"[T]wo merchants might buy watches at wholesale for $20 which normally sell at retail for $40. Both might sell immediately to a consumer who agreed to pay $1 per week for 52 weeks. In one case, the merchant might claim that the price of the watch was $40 and that the remaining $12 constituted a charge for extending credit to the consumer. From the consumer's point of view, the credit charge represents the cost which he must pay for the privilege of deferring payment of the debt he has incurred. From the creditor's point of view, the charge may represent the return which he might have earned had he been able to invest the proceeds from the sale of the watch from the date of the sale until the date of payment. The second merchant might claim that the price of the watch was $52 and that credit was free. The second merchant, like the first, has forgone the profits which he might have achieved by investing the sale proceeds from the day of the sale on. The second merchant may be said to have 'buried' this cost in the price of the item sold. By whatever name, the $12 differential between the total payments and the price at which the merchandise could have been acquired is the cost of deferring payment.

"Id. at 366 n. 26, 93 S.Ct. 1652. The facts in this case are substantially similar to those in the Court's hypothetical. Indeed, the Walkers allege that Wallace, like the second merchant, buried part of the cost of credit in the "cash" price. [6] As the Court noted, this extra charge above the amount paid by a cash customer is "the cost of deferring payment." Id. Under TILA, that cost must be disclosed as a finance charge." *Walker v. Wallace Auto Sales, Inc*., 155 F.3d 927, 932 - 933 (7th Cir., 1998).

Defendants' vague contract does not let anyone know whether he charged more because he only demanded $3,000.00 initially and planned to collect the sum through invoices or *quantum meruit*. It is unknown whether the $3,000.00 was spent on services or court costs or whether some was retained, a finance charge, for Defendants' benefit. Defendants offer no clarification on this point and have never provided time records or an accounting of any kind. Like the Supreme Court's jewelery seller, Defendants may have factored a finance charge into the "retail price" offered the Zausas.

Defendants have failed to show they did not collect a finance charge, and the Motion to Dismiss must be denied.

## II.    STATE LAW CLAIMS

Whether to relinquish jurisdiction of the state-law claims if the TILA claim is dismissed is within the Court's discretion.

### CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss must be denied.

Respectfully submitted,

/s/Kelli Dudley

By: _____
Kelli Dudley, Attorney for Plaintiffs Jack Zausa and Terri Kamin Zausa

Kelli Dudley, The Law Office of Kelli Dudley
1658 Milwaukee, #100-8377
Chicago, IL 60647
Ph: 312-771-9770
Email: attorneykelli@sbcglobal.net
ID 6279068